# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | FILED |
|---|---|
| | CLERK, U.S. DISTRICT COURT |
| | 02/05/2021 |
| | CENTRAL DISTRICT OF CALIFORNIA |
| | BY: ___SW___ DEPUTY |

### NOTICE OF DOCUMENT DISCREPANCIES

To: ☑ U.S. District Judge / ☐ U.S. Magistrate Judge  KLAUSNER

From: S. Williams _____, Deputy Clerk     Date Received: 02/03/2021

Case No.: 2:20-cv-08153-RGK-RAO     Case Title: Mills v. Sparks, et al.

Document Entitled: Motion for Leave to Amend Complaint Pursuant to Fed. R. Civ. P.15(a)(2); and First Amended Complaint

Upon the submission of the attached document(s), it was noted that the following discrepancies exist:

☐ Local Rule 5-4.1        Documents must be filed electronically
☑ Local Rule 6-1          Written notice of motion lacking or timeliness of notice incorrect
☐ Local Rule 7-19.1       Notice to other parties of ex parte application lacking
☐ Local Rule 7.1-1        No Certification of Interested Parties and/or no copies
☐ Local Rule 11-3.1       Document not legible
☐ Local Rule 11-3.8       Lacking name, address, phone, facsimile numbers, and e-mail address
☐ Local Rule 11-4.1       No copy provided for judge
☐ Local Rule 11-6         Memorandum/brief exceeds 25 pages
☐ Local Rule 11-8         Memorandum/brief exceeding 10 pages shall contain table of contents
☐ Local Rule 15-1         Proposed amended pleading not under separate cover
☐ Local Rule 16-7         Pretrial conference order not signed by all counsel
☐ Local Rule 19-1         Complaint/Petition includes more than 10 Does or fictitiously named parties
☐ Local Rule 56-1         Statement of uncontroverted facts and/or proposed judgment lacking
☐ Local Rule 56-2         Statement of genuine disputes of material fact lacking
☐ Local Rule 83-2.5       No letters to the judge
☐ Fed. R. Civ. P. 5       No proof of service attached to document(s)
☑ Other:   Motion date not timely

**Please refer to the Court's website at www.cacd.uscourts.gov for Local Rules, General Orders, and applicable forms.**

## ORDER OF THE JUDGE/MAGISTRATE JUDGE

IT IS HEREBY ORDERED:

☐  The document is to be filed and processed.  The filing date is ORDERED to be the date the document was stamped "received but not filed" with the Clerk.  Counsel* is advised that any further failure to comply with the Local Rules may lead to penalties pursuant to Local Rule 83-7.

_____                    _____
Date                                       U.S. District Judge / U.S. Magistrate Judge

☒  The document is **NOT** to be filed, but instead **REJECTED**, and is ORDERED returned to counsel.*  Counsel* shall immediately notify, in writing, all parties previously served with the attached documents that said documents have **not** been filed with the Court.
02/05/2021                                 *Gary Klausner*
_____                    _____
Date                                       U.S. District Judge / U.S. Magistrate Judge

* The term "counsel" as used herein also includes any pro se party.  See Local Rule 1-3.

**COPY 1 -ORIGINAL-OFFICE       COPY 2 -JUDGE       COPY 3 -SIGNED & RETURNED TO FILER       COPY 4 -FILER RECEIPT**

CV-104A  (06/13)                    NOTICE OF DOCUMENT DISCREPANCIES



ORIGINAL

FAXED

1  MARK A. MILLS
   100 S. DOHENY DRIVE, UNIT #223
2  LOS ANGELES, CA 90048
   PH: (424) 302-0988
3  E-MAIL: MMILLS@INNOVATIVEMAR.COM

4  IN PRO PER

5

6

7              UNITED STATES DISTRICT COURT

8              CENTRAL DISTRICT OF CALIFORNIA

9  Mark A. Mills                         Case No. CV20-8153-RGK(RAOx)

10                          Plaintiff,    **MOTION FOR LEAVE TO AMEND**
                                          **COMPLAINT PURSUANT TO FED. R.**
11      vs.                               **CIV. P. 15(a)(2)**

12 Nicholas Sparks, an individual; Hachette   **Hearing Date: February 1, 2021**
   Book Group, Inc., A Delaware
13 Corporation; and Does 1-10, inclusive,  **Hearing Time: 9:00 a.m.**

14                          Defendants.   **Judge: R. Gary Klausner**

15                                         **Action Filed: September 1, 2020**

16

17

18        Plaintiff respectfully submits this Memorandum of Points and Authorities in Support of

19 Plaintiff's Motion for Leave to Amend Complaint.

20

21

22

23

24

25 //

26 //

27 //

28

                                          1
─────────────────────────────────────────────────────
        PLAINTIFF'S OPPOSITION TO DEFENDANT'S NOTICE OF MOTION AND
              MOTION TO DISMISS PLAINTIFF'S COMPLAINT

I.    **INTRODUCTION**

The Court should grant Plaintiff's motion for leave to amend complaint because Plaintiff meets the requirements under Fed. R. Civ. P. 15(a)(2) and because Plaintiff is a pro se litigant.

II.    **PROCEDURAL HISTORY**

Plaintiff filed an original complaint against Defendant(s) on 9/1/2020.

Defendant(s) filed responsive pleading(s) on January 15, 2021.

III.    **ARGUMENT**

Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave [to amend a complaint] when justice so requires". Fed. R. Civ. P. 15(a)(2). The district court has the discretion to decide whether to grant Plaintiff leave to amend. See Swanson v. U.S. Forest Serv., 87 F.3d 339, 343 (9th Cir. 1996); Jordan v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir.1982), vacated on other grounds, 459 U.S. 810 (1982). In its exercise of this discretion, the court applies Rule 15 to "facilitate [a] decision on the merits, rather than on the pleadings or technicalities." U.S. v. Webb, 655 F.2d 977, 979 (9th Cir. 1981). Furthermore, the court interprets the language for granting amendments under Rule 15 with "extreme liberality." Id.

**A. Under the Ninth Circuit Standard Plaintiff Should Be Granted Leave to Amend.**

When deciding whether to grant leave to amend, a court must consider: (1) whether the amendment was filed with undue delay; (2) whether the movant has requested the amendment in bad faith or as a dilatory tactic; (3) whether movant was allowed to make previous amendments which failed to correct deficiencies of the complaint; (4) whether the amendment will unduly prejudice the opposing party and; (5) whether the amendment is futile. See Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (citing Foman v. Davis, 371 US 178, 182 (1962)).

The five factors are not considered equally. Prejudice is the most important factor and is given the most weight. Eminence, 316 F.3d at 1052. Therefore, "[a]bsent prejudice, or a strong showing of any of the remaining Foman factors, there exists a presumption under Rule 15(a) in

1  favor of granting leave to amend." Id. See also Talwar v. Creative Labs, Inc., No. CV 05-3375,

2  2007 WL 1723609 (C.D. Cal. June 14, 2006) (finding the plaintiffs should be granted leave to

3  amend because additional discovery would not unduly prejudice the defendant and the defendant

4  did not make a strong enough showing of bad faith on the part of the plaintiffs or that the

5  plaintiffs requested leave to amend as a dilatory tactic, despite the suspect timing of the filing).

6         The Ninth Circuit has also held that one of the five Foman factors alone is not sufficient to

7  justify the denial of a request for leave to amend. The Ninth Circuit has found that undue delay

8  alone "is insufficient to justify denying a motion to amend" and has "reversed the denial of a

9  motion for leave to amend where the district court did not provide a contemporaneous specific

10  finding of prejudice to the opposing party, bad faith by the moving party, or futility of the

11  amendment." Bowles v. Reade, 198 F.3d 752, 758 (9th Cir. 1999).

12         In this case, Plaintiff's amendment will not unduly prejudice Defendant because they have

13  access to the same supplemental information described in the Amended Complaint because they

14  still have Plaintiff's original manuscript in their possession.

15         Plaintiff did not file the amendment with undue delay. Rather, Plaintiff filed the

16  amendment after being denied an extension to answer Defendant's Motion to Miss.

17         Plaintiff does not request leave to amend in bad faith or for dilatory reasons. Rather,

18         Plaintiff requests leave to amend in order to further substantiate claims for copyright

19  infringement and racial discrimination.

20  Plaintiff's amendment is not futile because a thorough comparative analysis has been provided in

21  the Amended Complaint to substantiate a hearing for copyright infringement and racial

22  discrimination.

23                **B.  Plaintiff Is a Pro Se Litigant and Should Be Granted Leave to Amend.**

24         Courts give special consideration to pro se litigants requesting leave to amend a

25  complaint. "Courts are particularly reluctant to deny leave to amend to pro se litigants." Flowers

26  v. First Hawaiian Bank, 295 F.3d 966, 976 (9th Cir. 2002). In particular, "[u]nless it is absolutely

27  clear that no amendment can cure the defect … a pro se litigant is entitled to notice of the

28

1 | complaint's deficiencies and an opportunity to amend prior to dismissal of the action." Lucas v.

2 | Dept. of Corrections, 66 F.3d 245, 248 (9th Cir. 1995).

3 | **IV.   CONCLUSION**

4 | Based on the above reasons, this Court should grant Plaintiff's motion.

7 | DATED:  2/1/2021

8 | By:  _Mark A. Mills_

9 | Mark A. Mills, In Pro Per

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

| Attorney or Party without Attorney:<br>MARK A. MILLS<br>100 S. DOHENY DRIVE, UNIT #223<br>LOS ANGELES, CA 90048<br>  *Telephone No:*  (424) 302-0988<br><br>  *Attorney For:*  IN PRO PER | | | | *For Court Use Only* |
|---|---|---|---|---|
| | *Ref. No. or File No.:* | | | |
| *Insert name of Court, and Judicial District and Branch Court:*<br>UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA | | | | |
| *Plaintiff:*  Mark A. Mills<br>*Defendant:*  Nicholas Sparks, an individual, et al. | | | | |
| **PROOF OF SERVICE**<br>**By Federal Express** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>CV20-8153-RGK(RAOx) |

1.  *I am over the age of 18 and not a party to this action. I am employed in the county where the shipment occurred.*

2.  I served copies of the First Amended Complaint; Motion for Leave to Amend Complaint

3.  By placing a true copy of each document in a sealed envelope by **Federal Express** with delivery fee
    prepaid as follows:
    a. Federal Express Tracking Number: 7727 9842 9783
    b. Date Shipment Prepared: Tue, Feb 2, 2021
    c. Place of Preparation: LOS ANGELES, CA 90026
    d. Addressed as follows: Linda Steinman | DAVIS WRIGHT TREMAINE LLP
                        1251 Avenue of the Americas, 21st Floor, New York, NY 10020

4.  *I am readily familiar with the business practice for collection and processing of correspondence as deposited with Federal Express
    Service on Tue, Feb 2, 2021 in the ordinary course of business.*

                                 Recoverable cost Per CCP 1033.5(a)(4)(B)

5.  *Person Serving:*
    a. George A. Tavera, III
    **b. FIRST LEGAL**
       1517 W. Beverly Boulevard
       LOS ANGELES, CA 90026
    c. (213) 250-1111

                               **d.** *The Fee for Service was:*
                               **e.** I am: Not a Registered California Process Server

6.  *I declare under penalty of perjury under the laws of the State of California and under the laws of the United States of America that
    the foregoing is true and correct.*

                                 02/02/2021

                                  *(Date)*                                 *(Signature)*



| Attorney or Party without Attorney:<br>MARK A. MILLS<br>100 S. DOHENY DRIVE, UNIT #223<br>LOS ANGELES, CA 90048<br>   Telephone No: (424) 302-0988 | | | | For Court Use Only |
|---|---|---|---|---|
|   Attorney For: IN PRO PER | Ref. No. or File No.: | | | |
| Insert name of Court, and Judicial District and Branch Court:<br>UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA | | | | |
| Plaintiff:   Mark A. Mills<br>Defendant:   Nicholas Sparks, an individual, et al. | | | | |
| **PROOF OF SERVICE**<br>**By Federal Express** | Hearing Date: | Time: | Dept/Div: | Case Number:<br>CV20-8153-RGK(RAOx) |

1. *I am over the age of 18 and not a party to this action. I am employed in the county where the shipment occurred.*

2. I served copies of the First Amended Complaint; Motion for Leave to Amend Complaint

3. By placing a true copy of each document in a sealed envelope by **Federal Express** with delivery fee
   prepaid as follows:
   a. Federal Express Tracking Number:
   b. Date of Shipment Prepared: Tue, Feb 2, 2021
   c. Place of Preparation: LOS ANGELES, CA 90026
   d. Addressed as follows: Diana Palacios | DAVIS WRIGHT TREMAINE LLP
                 865 S. Figueroa Street, 24th Floor Los Angeles, CA 90017

4. *I am readily familiar with the business practice for collection and processing of correspondence as deposited with Federal Express Service on Tue, Feb 2, 2021 in the ordinary course of business*

Recoverable cost Per CCP 1033.5(a)(4)(B)

5. *Person Serving:*
   a. George A. Tavera, III
   **b. FIRST LEGAL**
      1517 W. Beverly Boulevard
      LOS ANGELES, CA 90026
   c. (213) 250-1111

   d. *The Fee for Service was:*
   e. I am: Not a Registered California Process Server

6. *I declare under penalty of perjury under the laws of the State of California and under the laws of the United States of America that the foregoing is true and correct.*

02/02/2021
*(Date)*

*(Signature)*



**PROOF OF SERVICE**
**BY FEDERAL**
**EXPRESS**

5315041
(4567595)

ORIGIN ID:JGXA      (213) 250-1111
JOCK ELLIS
FIRST LEGAL SUPPORT SERVICES
1517 W BEVERLY BLVD

LOS ANGELES, CA 90026
UNITED STATES US

SHIP DATE: 02FEB21
ACTWGT: 1.00 LB
CAD: 108056565/INET4340

BILL SENDER

TO **CLERK OF THE COURT**
   **USDC-LOS ANGELES**
   **255 EAST TEMPLE STREET**

   **LOS ANGELES CA 90012**
   (213) 894-0289                    REF: 4567610
   INV:
   PO:                               DEPT:



FedEx Ship Manager - Print Your Label(s)

WED - 03 FEB 4:30P
**STANDARD OVERNIGHT**

TRK#
0201    **7727 9832 7527**

**WZ EMTA**          CA-US

**90012**
**LAX**



Extremely Urgent

2/2/2021

FedEx Express



MARK A. MILLS
100 S. DOHENY DRIVE, UNIT #223
LOS ANGELES, CA 90048
PH: (424) 302-0988
E-MAIL: MMILLS@INNOVATIVEMAR.COM

IN PRO PER



RECEIVED

FILED
CLERK, U.S. DISTRICT COURT

FEB - 3 2021

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark A. Mills | Case No. CV20-8153-RGK(RAOx) |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR (1) COPYRIGHT INFRINGEMENT, (2) RACIAL DISCRIMINATION** |
| vs. | |
| Nicholas Sparks, an individual; Hachette Book Group, Inc., A Delaware Corporation; and Does 1-10, inclusive, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

TO THE HONORABLE COURT AND TO ALL PARTIES:

Plaintiff Mark Mills ("Plaintiff") respectfully submits this Memorandum of Law (i) in opposition to Defendant's Motion to Dismiss Pursuant to, and (ii) in reply to its Motion to Dismiss Plaintiff's Complaint pursuant to L.R.703 ("Motion to Dismiss") filed by Plaintiff regarding copyright infringement and racial discrimination.

FIRST AMENDED COMPLAINT FOR (1) COPYRIGHT INFRINGEMENT, (2) RACIAL DISCRIMINATION; DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

MEMORANDUM POINTS AND AUTHORITIES.........................................................4

COMPLAINT............................................................................................................5

INTRODUCTION......................................................................................................5

JURISDICTION AND VENUE.................................................................................5

PLAINTIFF..............................................................................................................6

DEFENDANTS.........................................................................................................6

DEFENDANT'S UNLAWFUL PRACTICES............................................................6

CLAIMS OF RELIEF...............................................................................................9

    First Claim of Relief (Copyright Infringement)...................................................10

    Protected Expression.........................................................................................10

    Access...............................................................................................................11

    Damages...........................................................................................................11

    Substantial Similarity.......................................................................................12

    Major Plot........................................................................................................13

CHARACTERS........................................................................................................13

    Grace and Sophia..............................................................................................14

    Luke and Clay...................................................................................................16

    The Best Friend: Marcia/Kendall......................................................................17

    The Ex-Boyfriend.............................................................................................18

    Stan and Brian..................................................................................................19

SETTING AND FURTHER CHARACTER HISTORY.............................................19

The First Meeting....................................................................................19

The After Party.......................................................................................21

The Ex's Failed Apology...........................................................................21

The Date...............................................................................................21

Education History....................................................................................22

Different Worlds.....................................................................................22

Research...............................................................................................22

First Sexual Experience............................................................................23

The Best Friend's Objection......................................................................24

The Ex's Failed Revenge..........................................................................24

THEME AND MOOD.................................................................................24

POINT OF VIEW......................................................................................25

DIALOGUE.............................................................................................25

BOOK AND MOVIE: More Similarities........................................................25

RESOLUTION.........................................................................................25

COPYRIGHT INFRINGEMENT...................................................................31

Substantial Similarity..............................................................................32

Protectable Expression............................................................................32

Probative Access....................................................................................33

SECOND CLAIM FOR RELIEF-RACIAL DISCRIMINATION...........................33

RACIAL DISCRIMINATION.......................................................................35

Statute of Limitations..............................................................................35

-2-

     Conspiracy to Discriminate...................................................................................35

PRAYER FOR RELIEF...................................................................................36

DEMAND FOR JURY TRIAL.........................................................................37

CONCLUSION................................................................................................37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-3-

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>

1.  *Fox Broad. Co. v. Dish Network L.L.C.*
    747 F.3d 1060, 1067 (9th Cir. 2014)

2.  *Petrella v. Metro-Goldwyn-Mayer, Inc.*
    134 S. Ct. 1962, 1976 (2014)

3.  *Gates Rubber Co. v. Bando Chem. Indus.* Ltd., 9
    F.3d 823, 832 (10th Cir. 1993)

4.  *Rentmeester v. Nike, Inc.*
    883 F.3d 1111, 1117 (9th Cir. 2018)

5.  *E.g., Peters v. West, 692 F.3d 629*
    633 (7th Cir. 2012)

6.  *Arnstein v. Porter*
    154 F.2d 464, 468 (2d Cir. 1946)

7.  *Mattel, Inc. v. MGA Ent'mt, Inc.*
    616 F.3d 904, 913–14 (9th Cir. 2010)

8.  *Christensen v. County of Boone*
    483 F.3d 454, 458 (7th Cir. 2007)

9.  *National Railroad Passenger Corp. (Amtrak) v.
    Morgan*
    536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d
    106 (2002)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

-4-

28

**FIRST AMENDED COMPLAINT FOR (1) COPYRIGHT INFRINGEMENT, (2) RACIAL DISCRIMINATION,
DEMAND FOR JURY TRIAL**

1

## COMPLAINT

2     Plaintiff, Mark A. Mills ("Plaintiff"), alleges as follows:

3

### INTRODUCTION

4     Plaintiff brings this action under to 17 U.S.C. § 501, *et seq.* including § 201 et

5     seq. (copyright infringement); and 28 U.S.C. §§ 1331 (federal question jurisdiction),

6     1338(a) and 1338(b) against NICHOLAS SPARKS, HACHETTE BOOK GROUP

7     INC., and Does 1-10, inclusive (collectively, "Defendants).

8

### JURISDICTION AND VENUE

9     1.     This Court has subject matter jurisdiction over this lawsuit under 28

10    U.S.C. § 1338, because, inter alia, the action arises under the copyright laws of the

11    United States.

12    2.     This Court has personal jurisdiction over all Defendants as, on

13    information and belief, they all regularly transact business in the Central District of

14    California. Further, on information and belief, the Defendants have purposefully

15    availed themselves of the privilege of conducting activities within this district.

16    Among other things, and on information and belief, Defendants systematically and

17    continuously direct business activities toward and into the Central District of

18    California, including offering for sale and selling copies of the infringing work within

19    this judicial district. Additionally, on information and belief, Defendants solicit

20    writers in this District and have sold movie rights to a company headquartered in this

21    District. This Court also has personal jurisdiction over all Defendants because

22    Defendants' tortious conduct, as alleged herein, has caused injury to Plaintiff, who

23    resides in this judicial district.   On information and belief, Defendants willfully

24    infringed Plaintiff's copyrights knowing that Plaintiff resided within this judicial

25    district.

26

27                                           -5-

28

1       3.      Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a

2 substantial part of the events or omissions giving rise to these claims for copyright

3 infringement occurred in this district and Defendants have significant contacts with

4 the district.

5                                  **PLAINTIFF**

6       4.      Plaintiff, Mark A. Mills is an African-American author, living in Los

7 Angles, California. He is the author of two books, and the manuscript ""Everything Is

8 Not Enough," which is registered as copyrighted material.

9                                **DEFENDANTS**

10       5.      On information and belief, defendant, Nicholas Sparks is a European-

11 American novelist and screenwriter. He is credited with writing the novel "The

12 Longest Ride" and co-writing the screenplay, "The Longest Ride." On information

13 and belief, Sparks lives in North Carolina.

14       6.      On information and belief, Defendant Hachette Book Group, Inc.,

15 (hereinafter referred to as "Hachette") is a Delaware corporation with a principal place

16 of business at 1290 Avenue of the Americas, New York, New York, 10104; and an

17 office in Los Angeles. On information and belief, Hachette does business throughout

18 the United States, including within this judicial district. Hachette operates a division

19 known as "Grand Central Publishing." Grand Central Publishing is the publisher of

20 the Nicholas Sparks novel, "The Longest Ride."

21               **DEFENDANTS' UNLAWFUL PRACTICES**

22       7.      Plaintiff Mark A. Mills is a graduate of Columbia University's MFA

23 Creative Writing Program, the author of two books and internationally published in

24 fiction.

25       8.      Plaintiff is the author of the copyrighted work, "Everything Is Not

26 Enough."

27

-6-

28

---

**FIRST AMENDED COMPLAINT FOR (1) COPYRIGHT INFRINGEMENT, (2) RACIAL DISCRIMINATION,**
**DEMAND FOR JURY TRIAL**

9.     Mr. Mills' work, "Everything Is Not Enough was created and copyrighted in or before 2011, with a date of execution effective with the U.S copyright Office as of March 11, 2016. Registration Number / Date: TXu001996547 / 2016-03-11.

10.     Mr. Mills uses the copyright symbol, ©, on his copyrighted works.

11.     On January 8, 2013, Mr. Mills e-mailed revisions to his manuscript, "Everything Is Not Enough," to Grand Central Publishing, pursuant to the request of Grand Central Publishing's representative.

12.     On January 25, 2013, Grand Central Publishing rejected Mr. Mills' manuscript, "Everything Is Not Enough".

13.     Nicholas Sparks is the author of the book entitled, "The Longest Ride", ISBN-10: 978-1455520633, ISBN-13: 9781455520633 (the "Infringing Book"), which, on information and belief, was first published in or around September 2013. The Infringing Book has a retail price ranging from approximately $3.99-$14.99 at Amazon.com.

14.     The main story line of the Infringing Book is centered on the romantic journey of two characters, Sophia and Luke, after Sophia, the female lead character, is cajoled by her best friend into going to the rodeo. This story line is a distinguishing feature of Mr. Mills' manuscript.

15.     On October 9, 2012, Mr. Mills provided approval to his agent, Frank Wheaton, to email his manuscript, "Everything Is Not Enough," to Grand Central Publishing.

16.     On information and belief, Grand Central Publishing publishes Nicholas Sparks' novels.

-7-

1       17.    On September 17, 2013, Grand Central Publishing published the novel

2  "The Longest Ride," which is authored by Nicholas Sparks, and registered a copyright

3  for same on February 7, 2014.

4       18.    On information and belief, Sparks and Hachette used content from Mr.

5  Mills' work "Everything Is Not Enough" in this novel ""The Longest Ride"" without

6  authorization.

7       19.    On information and belief, Sparks and Hachette were aware that they did

8  not have authorization to use the content from Mr. Mills' work or to register a

9  copyright for said content.

10      20.    Mr. Mills did not authorize Sparks or any of the Defendants to use his

11  copyrighted work.

12      21.    Mr. Mills' had no intention of granting a license of any kind to his work

13  to any of the Defendants.

14      22.    On information and belief, despite Defendants knowing that they did not

15  have Mr. Mills' authorization; Defendants copied and published expressive elements

16  of Mr. Mills' work, which was submitted to the publishing company on October 9,

17  2012.  Defendants subsequently published and registered the infringing copy on

18  September 17, 2013.

19      23.    On information and belief, Hachette is the publishing company for

20  Sparks' novels, and directed and profited from the unauthorized copying and

21  infringement of Mr. Mills' copyrighted work.

22      24.    Defendants' copying, republication and exploitation of Mr. Mills'

23  copyrighted work was without authorization from Mr. Mills.  Defendants' copying

24  was willful, oppressive, malicious and with wrongful intent to infringe the rights of

25  Mr. Mills.

26      //

27                            -8-

28

## CLAIMS OF RELIEF

## FIRST CLAIM OF RELIEF

### (Copyright Infringement – against all Defendants)

25.    At all times relevant hereto, Plaintiff has been the owner, author and/or assignee of all copyright rights or rights to assert copyright claims for his work "Everything Is Not Enough" and all derivative works.

26.    Defendants' copying, reproduction, and republication were commercial in character and purpose. Defendants either completely or substantially copied Plaintiff's original, copyrighted content. Because the copying was for commercial purposes, it did not constitute fair use under any doctrine of copyright law.

27.    Plaintiff did not authorize Defendants' copying, displaying, or republishing of his work "Everything Is Not Enough." Defendants infringed the copyrights of Plaintiff's creative work by, *inter alia,* reproducing, republishing, publicly displaying, and creating derivatives of the work.

28.    As a result of Defendants' infringement, Plaintiff has suffered, and will continue to suffer, substantial losses.

29.    Defendants knew the infringed works belonged to Plaintiff and that they did not have authorization to exploit Plaintiff's works. Defendants' infringements were, therefore, willful.

30.    On information and belief, Defendants induced, caused and materially contributed to the infringing acts of others by encouraging, inducing, allowing, and assisting others to reproduce and republish Plaintiff's works. Further, on information and belief, Defendants had knowledge of the infringing acts of others relating to Plaintiff's copyrighted works.

31.    Without authorization, Defendants used, copied, reproduced, and republished the copyrighted material. Plaintiff's manuscript and the Infringing Book

-9-

1  have substantially similar characters (i.e., precise attributes and history); narrator point
2  of view; main plot points/actions; and sequences of event. Taken as a whole, the
3  numerous examples of copyright violation in the Infringing book are greater than the
4  sum of its parts.

5       32.    On information and belief, Defendants have the right and ability to
6  control the infringing acts of the individuals and entities that directly infringed
7  Plaintiff's works.

8                                            **Protected Expression**

9       33.    Further, on information and belief, Defendants obtained a direct financial
10  benefit from the infringing activities of the individuals or entities that directly
11  infringed Plaintiff's work. Plaintiff's first cause of action succeeds because there are
12  numerous substantial similarities.  Importantly, the protected expression of many of
13  those significant similarities may be different because of race and culture: the
14  Plaintiff, who is the author of the infringed upon work (the manuscript for Everything
15  is Not Enough), is African-American, and his characters are African-American.
16  Conversely, the infringing party, Nicholas Sparks, is European-American, and his
17  characters are European-American. Hence, the protected expression of the substantial
18  similarities from the infringed upon work will be different in some cases, such as
19  dialogue.

20       34.    If the Plaintiff were European-American and his characters were
21  European-American, then the protected expression of the substantial similarities
22  would be the same – apples to apples for each similarity – but as White and Black
23  cultures are different, it is clear that the substantial similarities of the Plaintiff's work
24  were filtered and expressed by the White Defendant through a European-American
25  lens, with the goal of masking the substantial similarities' origin. In sum, Defendant,
26  Sparks used his access to infringe upon the Plaintiff's work by using it as a clear and

27

28

-10-

1  detailed blueprint for the plot and other extrinsic elements of his novel, The Longest
2  Ride, and movie of the same name.

### Access

4      35.    Additionally, the second prong of copyright infringement is access. In
5  this case, there is clear evidence of access, as emails will attest: Plaintiff's agent had
6  emailed Plaintiff's manuscript (Everything is Not Enough) to the Defendant's
7  publisher significantly before the Defendant copyrighted and published his novel The
8  Longest Ride.

### Damages

10      36.    Defendants' actions, as set forth above, constitute copyright infringement
11  in violation of the Copyright Act, 17 U.S.C. § 501, et seq., all to the damage of
12  Plaintiff as previously alleged.

13      37.    By reason of the foregoing unlawful acts recited in the above paragraphs,
14  Plaintiff has been irreparably harmed and will continue to suffer damage until an
15  appropriate injunction and damages award are imposed by this Court.

16      38.    Accordingly, the Defendants have directly, contributorily, and
17  vicariously infringed upon Plaintiff's copyrighted work.

18      39.    Defendants' infringement has caused and is causing irreparable harm to
19  Plaintiff. Unless this Court restrains Defendants from further infringing Plaintiffs'
20  protected work, the Plaintiff will continue to suffer irreparable harm with future
21  distribution and releases.

22      40.    Also, by engaging in the alleged conduct, Defendants are in violation of
23  U.S. Code Title 42, Chapter 21. As an actual and proximate result of Defendants'
24  copyright infringement, Defendants have unjustly enriched themselves by, among
25  other things, obtaining profits, depriving Plaintiff of compensation to which he is
26  rightly entitled, and taking credit for Plaintiffs' original copyrighted work.

-11-

**FIRST AMENDED COMPLAINT FOR (1) COPYRIGHT INFRINGEMENT, (2) RACIAL DISCRIMINATION, DEMAND FOR JURY TRIAL**

1    41.    Plaintiff is entitled to the relief provided by 17 U.S.C. §§ 502-505,

2  including but not limited to, injunctive relief, an order for the impounding and

3  destruction of all of Defendant's infringing copies and/or derivative works,

4  compensatory damages (including, but not limited to actual damages and/or

5  Defendant's profits), statutory damages, punitive damages, and Plaintiffs costs and

6  attorneys' fees in amounts to be determined at trial.

7                              **Substantial Similarity**

8    42.    Nicholas Sparks' The Longest Ride novel (and his movie of the same

9  name) have striking similarities to Mark A. Mills' unpublished manuscript Everything

10  Is Not Enough. While any of these similarities individually could perhaps be

11  dismissed as a coincidence or as a byproduct of genre or trope, the Court must

12  question how so many striking similarities (more than 40) could have possibly arisen

13  without Defendants having an awareness of Plaintiff's manuscript.

14    43.    For example, Sparks' novel opens with the best friend of the Female

15  Main Character (henceforth "the FMC") cajoling her into attending the rodeo. Later,

16  in Sparks soft cover book (pg. 288), as in Mills' manuscript (pg. 82-84), the FMC's

17  best friend warns her about a life with Luke, the main male character (henceforth

18  "MMC"). In Sparks' novel, the MMC and FMC meet when the MMC falls riding a

19  bull – common enough – but then the MMC goes into the stands to introduce himself

20  to the FMC, as in Mills' manuscript.  In both works, the FMC is an educated young

21  woman who begins a romance with the MMC, a danger-courting bull rider.

22    44.    Mills' and Sparks' works unfold to tell the story about a young attractive

23  rodeo cowboy falling in love with a successful young woman from a sophisticated

24  world, be it art or finance, and the difficult choices they are faced with if their love is

25  to endure. Mills' couple is Grace and Clay; Sparks' is Sophia and Luke.

26

27                                        -12-

28

**Major Plot Points**

45.     In both works, we see the following: when the FMC's outgoing best friend, hoping to help her get over her unfaithful ex-boyfriend, cajoles her to go to the rodeo, she meets the MMC, a dashing, acclaimed young bull rider attempting to make a comeback. Drawn by mutual attraction, the two quickly enter a relationship, even as the ex-boyfriend seeks to win the FMC back and exact revenge on the MMC. Complicating matters, the best friend disapproves of the relationship, calling into question the timing, as the FMC just broke up with her ex, as well as their long-term compatibility, as they have very different backgrounds and life plans. The couple does break up, but ultimately reunites after the MMC quits the rodeo. They come into unexpected economic good fortune and commit to a life together. The aforementioned are the major plot points infringed upon by the Defendant. These points, taken as a whole, conclusively prove substantial similarity.

46.     The examples provided by the Plaintiff as follows, are not tropes or scenes a faire, as they cannot be found in any books or movies about love affairs involving rodeo cowboys. Rather, they are clear indications of substantial similarities that came about as a result of Defendant's easy access to the Plaintiff's work, which testimony from an editor at Grand Central Publishing will corroborate.

47.     Substantial similarities between the two novels will be shown in the following sections, which describe numerous plot similarities. These similarities will range from macro-level observations to minor details.

**CHARACTERS**

48.     The characters in the Plaintiff's manuscript bear substantial similarity to the characters in the Defendant's Book. "In determining whether characters are similar, a court looks at the totality of the characters' attributes and traits as well as the extent to which the Defendants' capture the total concept and feel of the figures in the

-13-

1  Plaintiff's work." Shame on You Prods. Inc. v. Banks, 120 F. Supp. 3d 1123, 1165
2  (C.D. Cal 2015).  The numerous shared traits between the characters prove substantial
3  similarity.

4                                          **Grace/Sophia**

5       49.    Grace and Sophia are young, sweet, smart, shy, bookish, nerdy,
6  privileged, attractive, and in white-collar employment.

7       50.    When Grace was a child, her mother felt that she was "dark and ugly"
8  (Mills 10), a sentiment shared by her classmates, who tell her she looks like "burnt
9  toast" (Mills 11).

10      51.    A similar sentiment is expressed about Sophia. Sparks writes, "Growing
11 up, she'd always been gawky, with long skinny legs, zero in the hips department, and
12 prone to the occasional bout of acne. It wasn't until she was a junior in high school
13 that she'd needed more than a training bra. All that had begun to change during her
14 senior year, although it mostly made her feel self-conscious and awkward" (Sparks
15 51).

16      52.    Grace, too, underwent a transformation. Mills writes, "But something
17 happened when Grace went to college at the age of 15. If she were taller she could
18 have been mistaken for a Seventeen model. Suddenly, there were boys everywhere
19 vying for her attention" (Mills 10).  Both Sophia and Grace have only been in a single
20 relationship; for each, their former partner is the only person with whom she has had
21 sex (Mills 33, Sparks 212).

22      53.    In Mills' opening scene at the rodeo, Kendall asks Grace, "You're still
23 thinking about Stan, aren't you?" to which Grace retorts, "'Of course not!'" (Mills 34)
24 A similar exchange takes place in the scene that opens the Sophia storyline: when
25 Sophia claims vaguely to be "tired of it," Marcia asks "You mean you're tired of
26 seeing Brian, right?" (Sparks 20) In both novels, the best friend brings up the reason

27                                           -14-

28

for the recent breakup--the ex-boyfriend's blatant infidelity (Mills 32, Sparks 21)--and assures the FMC that she will be fine, citing the rodeo as an opportunity to begin recovering from heartbreak (Mills 34-35, Sparks 20-21).

54.     Though Grace works on Wall Street and Sophia lives in a sorority--ostensibly very different spheres--the pressures of their environments are described similarly. Sophia is not from money, but she is nevertheless surrounded by it (not to mention the privilege afforded by attending and living at college, which Luke points out bitterly during an argument (Sparks 283).

55.     Sparks emphasizes that Sophia's world, like Grace's, is hierarchical and hypercompetitive. He writes, "The new crop of sophomore girls fretted endlessly about what everyone else thought of them and how best to fit in as they vied for a higher place in the pecking order" (Sparks 23).

56.     In addition, it is an environment dominated by generational wealth and prestige. Of the chapter president, Mary-Kate, Sparks writes, "With the added allure of her trust fund—her family, old tobacco money, was still one of the wealthiest in the state—to many people, she was the sorority" (Sparks 25).

57.     In Sparks' rendition, this is a world not far removed from Grace's Wall Street, where Grace struggles against high-pressure social dynamics worsened by elitism and nepotism.

58.     Examples of this are too numerous to cite individually, as it is one of the core conflicts of the novel, but Mills sums up Grace's struggle thus: "All the duplicitous, hateful colleagues who are less talented, but better connected, will laugh at her tumble down the corporate ladder" (Mills 9).  And for both Sophia and Grace, the pressure to succeed took root early.

59.     Grace and her family are keenly aware of the unique pressures of being people of color struggling to succeed and establish a reputation. As Grace remembers

-15-

her grandmother saying, "'You better get all A's and get a good career for yourself'" (Mills 10-11).

60.     Unlike Grace, Sophia is not a person of color, but Sparks emphasizes that she is a child of immigrants whose parents "arrived in the country with little more than the money they had in their pockets" (Sparks 31). In large part because of the struggles they have endured, they pressure Sophia to succeed. Sophia explains their attitude towards her art history major to Luke, saying, "'They wanted me to major in pre-med or pre-law or accounting. Something that will lead to a job when I graduate'" (Sparks 54).

61.     Another time, she tells Luke that her parents "were perfectionists when it came to grades" (Sparks 105): "We had to study in the kitchen, and my mom would quiz us before every test. And let me tell you, if I ever brought home a score that wasn't absolutely perfect, my mom and dad acted like it was the end of the world. My mom would wring her hands and my dad would tell me how disappointed he was and I'd end up feeling so guilty that I'd study again for a test that I'd already taken. I know it's because they never wanted me to struggle like they did, but it could be a little oppressive at times" (Sparks 105-106).

### Luke/Clay

62.     Clay and Luke are young, handsome, chiseled, charming and chivalrous rodeo cowboys, who have not achieved their career peak, and who are also both good listeners. Their life goals would take them away from Sophia/Grace.  Again, when Luke and Clay discuss their checkered educational history, it is revealed that both enjoyed certain aspects of school. Clay tries to downplay his academic ability, to which Clay's brother Lance responds, "'You were always good in music and English'" (Mills 303).

-16-

63.     Luke, too, gravitated towards the humanities. "I always liked history and geography," he says. "'But if you ask me about chemistry or algebra, I'd probably be lost'" (Sparks 53). Like Clay, Luke is slated to face the same fearsome bull at the end of the novel that he faced at the beginning – yet another startling similarity with Mills' work.

64.     While the similarities between Clay and Luke are mostly surface-level--namely, their shared profession, lack of social privilege, and career progression--the similarities between Grace and Sophia are deep and manifold.

### The Best Friend: Marcia/Kendall

65.     It would be impossible to find a cowboy romance where the best friend plays such a pivotal role as in Mills manuscript -- unless we read the Defendant's book. It is the best friend who cajoles her to attend the rodeo. It is also the best friend who warns her about the potential negatives of the relationship. In both works, our first introduction to the FMC is through her interactions with another girl. It is the FMC's bubbly best friend who pleads with her to come to the rodeo, where she ultimately meets the MMC.

66.     For Grace, the best friend is Kendall, and for Sophia, it is Marcia. Their mutual conclusion about the MMC is also the same? "'He's so hot!'" Marcia fawns (Sparks 94). "'Wow, he is so hot!'" exclaims Kendall (Mills 31). While the words used may be considered, commonplace, how likely is it that both characters would find it necessary to describe the MMC's attractiveness?  As pointed out above, neither, Marcia nor Kendall is happy with how their friend's romantic relationship unfolds--and they emphatically let the respective FMCs know.

67.     Kendall complains that no one ever sees Grace anymore (Mills 359); Marcia laments that Sophia is never around and that they "'...used to spend time together'" (Sparks 241). Kendall cites concerns for Grace's future, just as Marcia

-17-

1  does, citing the differences in their worlds and the timing of the relationship right after

2  the break-up. Both ask their friends whether they see themselves living and working

3  on a ranch for the rest of their lives (Mills 84-85, Sparks 242-243).

4       68.    Kendall peppers Grace with questions, probing her about her relationship

5  with Clay. She explains, "These are questions the old Grace would have asked, or

6  would ask me if the situation were reversed" (Mills 357). Marcia raises a near-

7  identical point, saying, "Think about how it looks—imagine what you'd say if our

8  roles were reversed" (Sparks 242).

9       69.    In both works, our first introduction to the FMC is through her

10  interactions with another girl. It is the FMC's bubbly best friend who pleads with her

11  to come to the rodeo, where she ultimately meets the MMC. For Mills' Grace, the best

12  friend is Kendall; and for Sparks' Sophia, it is Marcia. Their mutual conclusion about

13  the MMC is also the same.

14  **The Ex-Boyfriend**

15       70.    Both Sophia and Grace have only been in a single relationship; for each,

16  their former partner is the only person with whom she has had sex (Mills 33, Sparks

17  212). In Mills' opening scene at the rodeo, Kendall asks Grace, "'You're still thinking

18  about Stan, aren't you?'", to which Grace retorts, "'Of course not!'" (Mills 34) A

19  similar exchange takes place in the scene that opens the Sophia storyline: when

20  Sophia claims vaguely to be "tired of it," Marcia asks "You mean you're tired of

21  seeing Brian, right?" (Sparks 20).

22       71.    In both novels, the best friend brings up the reason for the recent

23  breakup--the ex-boyfriend's blatant infidelity (Mills 32, Sparks 21)--and assures the

24  FMC that she will be fine, citing the rodeo as an opportunity to begin recovering from

25  heartbreak (Mills 34-35, Sparks 20-21).

26

27  -18-

28

---

**FIRST AMENDED COMPLAINT FOR (1) COPYRIGHT INFRINGEMENT, (2) RACIAL DISCRIMINATION,
DEMAND FOR JURY TRIAL**

**Stan and Brian**

72.    Both Stan and Brian are highly influential and desirable figures in their social circles. Stan is "head of sales and trading for a prestigious New York banking firm" (75); Brian is "An all-American lacrosse player blessed with startlingly good looks and a wealthy investment banker father" (p. 28). The substantial similarities with the ex-boyfriend plot arc will be further explained.

## SETTING AND FURTHER CHARACTER HISTORY

73.    Mills' novel opens on Grace's best friend Kendall talking eagerly of the rodeo as Grace expresses doubts, allowing her mind to wander to her investment banking career. Like Grace, Sophia is presented from the beginning as an intellectual. Our very first glimpse of Sophia is of her reviewing Renaissance history notes even as her best friend Marcia extols the virtues of the rodeo, begging her to come (Sparks 19).

## The First Meeting

74.    In both novels, it is the MMC who notices the FMC first, but initially, the timing of this fateful moment seems to differ. In Mills' novel, the MMC catches sight of the FMC during the rodeo itself (Mills 23). Sparks, on the other hand, chronologically separates these two events: first, the rodeo occurs, then, Luke sees Sophia at the after-party.

75.    Even so, Sparks conflates the rodeo and Luke's sighting of Sophia, overlaying one over the other as if they are happening simultaneously: "He was replaying the second ride when he first noticed the girl," writes Sparks (Sparks 42). This is the first of two instances in which Sparks employs the technique which I will refer to as "superimposition": splicing an event from Mills into two separate ones and then conflating them once more through narration such that it strongly resembles a scene from Everything Is Not Enough.

-19-

76.     As for the actual description of the MMC observing the FMC, Mills' description and Sparks' follow very similar emotional contours. First, the MMC notes the FMC's absorption in her own world. Then, he appreciates the FMC's physical beauty while being sure to note a certain je ne sais quoi about her. He concludes with his urge to care for this stranger, an impulse he does not quite understand.

77.     To facilitate a full comparison, here is Mills' rendition of the MMC's first sighting of the FMC:   "Two women wearing business suits. That's strange, he thinks, focusing on the one reading a book--reading a book?! As she lowers it he enjoys her glossy black hair, which is swept back into a bun, her dark chocolate complexion, which looks cool to the touch, her high, intelligent forehead; those almond-shaped eyes holding black diamonds; her full, slanted cheek bones; her cute bear-cub nose, which twitches slightly; her small, pretty mouth, and bee-stung lips; such a delicate oval face, he thinks. She looks young; he guesses that she's 25. For some reason he can't understand, noble intentions toward her swell in his chest. He acknowledges that yes, she's a stunner, but there's something more, and he can't put his finger on it. He's only certain that he wants to be her savior" (Mills 23).

78.     In Spark's novel, "It was hard not to appreciate the cascade of blond hair and deep-set eyes; he had the sense that, like him, she was wrapped up in her own thoughts. She was pretty, but beyond that, there was something wholesome and natural about her appearance, the kind of girl who probably looked equally at home in jeans or a formal gown. This was no dolled-up buckle-bunny, hoping to hook up with one of the riders. They were everywhere on tour and easy to find—a pair of them had sidled up to him in the barn and introduced themselves earlier—but he'd had no interest in encouraging them [Note: this something that happens in Mills' novel as well] But the girl on the railing interested him. There was something different about her, though he couldn't pinpoint what. Maybe, he thought, it was the unguarded,

-20-

1   almost vulnerable way she stared into the distance. Whatever it was, he sensed that
2   right now what she really needed was a friend. He considered going over to talk to
3   her, but he pushed aside the idea as he focused on the bulls in the distance" (Sparks
4   43).

5                               **The After-Party**

6          79.    During the after-party, Clay verbally and physically defends Grace from
7   a cowboy who makes an unwanted and rude advance on her (Mills 48). In Sparks'
8   novel, the nameless aggressor at the after-party is instead Sophia's ex-boyfriend, who
9   Luke tells to let go of Sophia and then pins to the ground (Sparks 35-37). In both
10  cases, the night concludes with the FMC and MMC sitting and talking in the MMC's
11  truck.

12                            **The Ex's Failed Apology**

13         80.    Stan and Brian both attempt to apologize and win back their respective
14  ex-girlfriends, expressing similar sentiments as they do. Stan says, "I know (sic) I
15  messed up so bad, that's why I'm in counseling. I don't ever want to put our love at
16  risk-ever" (Mills 427). In the Sparks novel, Brian says, "After you broke up with me,
17  I knew I'd made the biggest mistake of my life. Because I need you" (35). Both men
18  are theatrical and over-apologetic, each casting himself as the victim as he attempts to
19  win back his former girlfriend.

20                                  **The Date**

21         81.    In both novels, one of the FMC and MMC's first outings together is at an
22  Asian restaurant, and the MMC is out of his depth. In Clay's case, at Hemi's Korean
23  Barbecue, he struggles to use chopsticks and has to be taught by Grace (Mills 114-
24  115); in Luke's case, at Sakura Japanese Restaurant, he is unfamiliar with the cuisine
25  and does not know what to order off the menu, asking Sophia to order for him (Sparks
26  137-138).

27                                      -21-
28

**Education History**

82.     When Luke and Clay discuss their checkered educational history, it is revealed that both enjoyed certain aspects of school. Clay tries to downplay his academic ability, to which Clay's brother Lance responds, "'You were always good in music and English'" (Mills 303). In the Sparks novel, Luke, too, gravitated towards the humanities. "I always liked history and geography,'" he says. "'But if you ask me about chemistry or algebra, I'd probably be lost'" (Sparks 53).

**Different Worlds**

83.     The fact that the two protagonists of each work come from such different contexts means that the subject of their contrasting backgrounds is frequently addressed. Sometimes, the acknowledgment comes through humor. At the Korean barbecue restaurant, when Clay jokes, "Don't expect the same treatment when we go to Taco Bell, Grace quips back, "What's Taco Bell?" (Mills 109).

84.     In Spark's novel, compare this to Sophia's discussion of her life in New Jersey, including going to movies with friends, followed by her voicing the assumption that Luke "'...didn't do any of those things growing up.'" When Luke objects, and she asks, "'What was the last movie you went to?'", he responds jokingly, "'What's a movie?'" (Sparks 58-59).

85.     Other times, the characters address their different backgrounds in more explicit terms. "But our worlds are so different," muses Grace (Mills 260).  In the Spark's novel, Sophia's character has the same sentiment when thinking to herself, "...their worlds were entirely different" (Sparks 107).

**Research**

86.     When Clay asks Grace what she does for a living, she provides what he calls out as a dumbed-down version (Mills 65). Clay proceeds to fill in the blanks,

-22-

1   detailing everything he learned about her from a Google search, and she proceeds to
2   do the same for Clay.

3       87.    A similar exchange takes place in Sparks' novel. When Sophia suspects
4   that Luke is being overly humble about his accomplishments, she says, ""You might
5   as well tell me how good you were. I can always Google you, you know" (Sparks
6   103). Later on in the novel, she actually does look him up in order to learn information
7   he has withheld from her (Sparks 302).

8                            **The First Sexual Encounter**

9       88.    Grace and Clay's first sexual encounter is in Clay's shower, where Clay
10  first bathes her and then makes love to her (Mills 166-167). Though this is not quite
11  the case for Sophia, Sparks first describes her sexual history as she bathes in Luke's
12  house, right after he has stepped out of the shower (Sparks 211-212).

13      89.    Recall how Sparks superimposed Luke's first glimpse of Sophia over
14  Luke's mental review of his ride. Sparks employs a similar device of superimposition
15  when describing Luke and Sophia's first sexual encounter. While bathing, Sophia
16  recalls how she lost her virginity to her ex-boyfriend and fantasizes about Luke's
17  sexual desire for her. Upon stepping out of the bath, she deliberately selects a
18  provocative outfit with which to meet Luke, and a few hours later, she and Luke have
19  sex for the first time (Sparks 220).

20      90.    Perhaps it should be noted that in Sparks' film adaptation, the pair indeed
21  have sex for the first time in the shower, just as Grace and Clay do in Mills' novel.

22  //
23  //
24  //
25  //
26
27                                    -23-
28

1

### The Best Friend's Objection

2       91.    Neither Marcia nor Kendall is happy with how their friend's romantic

3 relationship unfolds--and they emphatically let the respective FMCs know. Kendall

4 complains that no one ever sees Grace anymore (Mills 359).

5       92.    In the Spark's novel, Marcia laments that Sophia is never around and that

6 they "'...used to spend time together'" (Sparks 241).

7       93.    Kendall cites concerns for Grace's future, just as Marcia does, citing the

8 differences in their worlds and the timing of the relationship right after the break-up.

9 Both ask their friends whether they see themselves living and working on a ranch for

10 the rest of their lives (Mills 84-85, Sparks 242-243).

11      94.    Kendall peppers Grace with questions, probing her about her relationship

12 with Clay. She explains, "These are questions the old Grace would have asked, or

13 would ask me if the situation were reversed" (Mills 357).   Marcia raises a near-

14 identical point, saying, "Think about how it looks—imagine what you'd say if our

15 roles were reversed" (Sparks 242).

16

### The Ex's Failed Revenge

17      95.    Sophia feels sick when she realizes that Brian might take it upon himself

18 to exact revenge upon Luke (Sparks 129). Indeed, Brian ultimately does just that,

19 ambushing Luke's car with a group of friends (Sparks 345-346). He is perhaps a more

20 benign version of Stan, who hires a mercenary to eliminate Clay (Mills 76).   Both

21 Brian's attempt and the mercenaries are thwarted.

22

### Theme and Mood

23 96.    Major and minor themes present overarching similarities between Sparks'

24 works and Mills': the idea of opposites attracting, love causing a distraction in one's

25 career goals, and the dilemma of having to choose between a career and love.  The

26 major theme of both works is expressed in a similar manner that does appear to be

27

-24-

28

random: Recovering from a recent breakup, the FMC meets a young cowboy, the MMC, who bears little resemblance to the privileged men she has dated in the past. Through the MMC, the FMC is introduced to a world where the stakes of life and death are high and omnipresent. As the FMC and MMC fall in love, the FMC finds herself imagining a future quite different from what she originally imagined. The main characters must reconcile their independent plans for the future if they are to have a life together.

### Point of View

97.     Like Mills' work, both of Sparks works follow the Point of View of the FMC: for Sparks, it's Sophia, for Mills, it's Grace.

### Dialogue

98.     As noted earlier, as the Plaintiff's African-American characters have been filtered through a European-American lens by a European-American author, hence the dialogue between the characters will be different.

### Resolution

99.     Both novels conclude with their respective main characters coming into financial fortune after the FMC nearly loses everything she has worked towards (Grace is fired; Mills 394).  In Spark's novel, Sophia is rejected from both internships (Sparks 365)).

100.   The couple commits to each other--Clay and Grace marrying (Mills 514), Sophia and Luke becoming engaged (Sparks 397).

### Book and Movie:  Further Substantial Similarities

101.   Both Mills' manuscript, and Sparks' screenplay and novel begin in earnest with the MMC facing a notorious and highly feared bull. Similarly, said bull tosses the Luke/Clay, who lands unconscious. When the MMC awakens, the bull ferociously chases him. After Luke/Clay is saved by two clowns who jump into the

-25-

ring to distract the bull, Luke/Clay goes into the stands to talk to the FMC, who was reticent about attending the event.

102.   The additional similarities cited below are found in Sparks' movie and/or book; page notations refer to Sparks' mass media soft-cover book. Below are some of the striking similarities.

    i.    Sophia's best friend convinces her to go to a bull riding event because there will be hot guys there; Page 30

    ii.    2. There are two announcers who voiceover Luke's accomplishments and set him up as a leading contender and heartthrob; page 49.

    iii.    The bull is distracted by rodeo clowns who jump into save Luke; pages 55 and 56.

    iv.    Luke/Clay and Sophia/Grace "meet cute" at the bull riding event; pages 56-59. "Meet cute" is a screenwriting term that maintains that the two-star-crossed lovers must meet in a cute fashion. Hence, Clay walks up the event stairs and playfully takes away the book Grace is reading. In the movie, Luke flirtatiously tells Sophia to keep his hat, which has fallen into her lap as he was falling from the bull.

    v.    Luke blacks out when he is thrown; page 56

    vi.    Luke has to mount a comeback because he has fallen in the standings; page 181

    vii.    Luke and Sophia meet up at a bar after the bull riding event, continue their flirtation and begin their courtship; page 66/all of chapter 4

    viii.    Luke & Sophia and Clay & Grace both go outside of the bar and talk.

    ix.    Luke didn't go to college, but knows a lot of things. Page 63

x.    Both of the female characters recently broke up because their ex-boyfriends cheated on them, and their former boyfriends are trying to win them back.

xi.    Sophia/Grace was a nerd in high school

xii.    Sophia/Grace doesn't think it will work because she doesn't need any distractions; page 61

xiii.    Sophia's best friend says, "You're the only one I know who wouldn't have a fling with a cowboy"; at dinner with Grace's girlfriends, Kendall says, "I told her just to have fun with him that one night in Houston," page 198

xiv.    Clay takes Grace to a place for dinner that's a surprise; page 141

xv.    Both couples go to an Asian restaurant. Clay fumbles with his chopsticks while Grace uses her chopsticks beautifully. Luke has never had sushi before while Sophia has had sushi many times and knows about it very well.

xvi.    Luke takes her for barbecue; Clay takes Grace for barbecue; page 151, In Mills' book, it's Korean barbecue; in Sparks' movie, it's a picnic barbecue.

xvii.    Luke/Clay are good listener; page 289

xviii.    Luke/Clay have a family ranch that's in trouble financially; page 370

xix.    Both couples are potentially separated by distance; pages 88-89

xx.    Sophia works at a high-class place (an art gallery and wants to move to New York from the South to work for a tony gallery), a world which Luke doesn't see himself fitting into. Grace works as an investment banker, a world Clay doesn't see himself fitting into; Clay has to decide if he will leave the South and move to be with Grace in New York.

-27-

FIRST AMENDED COMPLAINT FOR (1) COPYRIGHT INFRINGEMENT, (2) RACIAL DISCRIMINATION, DEMAND FOR JURY TRIAL

Sophia has to decide if she will move to New York or stay in the South with Luke.

xxi.  One page 128, Clay's best friend warns him about moving New York to chase after some girl way out of his league.

xxii.  Luke's trying to get back to the world championship in Vegas; 475-476

xxiii.  His parents didn't want him to ride bulls but rather concentrate on the family farm;

xxiv.  The couple in the b story loves dancing; it is one of the things that bind Clay and Grace throughout Mills' book

xxv.  Marcia (the best friend) warns Kendall about a life with Luke, p. 288

xxvi.  Luke/Clay and Sophia/Grace take numerous weekend trips; page 313

xxvii.  Luke/Clay and Sophia/Grace bond over food; throughout the book, e.g., 278

xxviii.  Luke/Clay knows how cook special things; e.g., pages 168 and 278

xxix.  Luke/Clay teaches her how to ride a horse in pastoral setting; page 215

xxx.  Sophia's/Grace's horse begins to gallop, and Luke/Clay has to slow it down; page 231

xxxi.  Luke/Clay makes her something special when she comes over, page 168

xxxii.  Luke/Clay and Sophia/Grace make love in the steamy shower; page 278

xxxiii.  Luke/Clay is uncomfortable in her world; page 280

xxxiv.  The B couple in Sparks movie: The man falls in love with woman at first sight; Just like Clay falls for Grace; pages 33-34

xxxv.  Luke on page 51; She was pretty, but beyond that there was something…
Clay on page 53; Yes, she is beautiful, but there's something more.

xxxvi.   The B couple: His place is messy with strewn dirty dishes and old food after his wife leaves him; page 482: Grace's state of mind and formally clean place after her breakup with Clay.

xxxvii.   Sophia's female friend Marcia was excited when she first learned that her friend was dating a hot cowboy, but once their relationship starts getting serious, she warns Sophia.

xxxviii.   Sophia thinks about Luke while taking a bath. Grace thinks about Clay while taking a bath.

xxxix.   Sophia on page 252; Brian had been the first and only guy she'd ever slept with. Grace on page 312;" I've only been with one guy."

xl.   The A couple in Sparks movie: When Sophia stops by to see Luke on the way back from New Jersey, "he caught her as she jumped, feeling her legs wrapped around him."

xli.   When Grace comes to see Clay at his loft, she "jump into his arms, wrapping her legs around his waist."

xlii.   Near the end of the story, Sophia's ex tries to hurt Luke, and Grace's ex tries to hurt Clay.

xliii.   Sophia stays in North Carolina, and sacrifices her internship in NYC; Clay moves to New York and sacrifices his rodeo career; Page 146: Clay does a Craig's List apartment swap and moves to New York, sacrificing his rodeo career.

xliv.   Luke/Clay faces off against the same notorious bull again to regain his competitive standings; page 476

xlv.   Luke has a near perfect ride; Clay has three perfect rides, pages 476-77

-29-

xlvi.   Luke/Clay defeats his arch nemesis, the same killer bull from the beginning of the movie that threw him and made him black out; page 476-477

xlvii.  Luke/Clay gives up riding after defeating the notorious bull; page 524

xlviii. At the end of the movie, Luke becomes a millionaire; Clay gets a million dollar check for winning the world championship.

103.   In this case, it is very clear that the sum of the parts is greater than the whole. Plaintiff possesses ownership of a valid copyright and Plaintiff can prove copying by the Defendant Sparks' of protectable elements of the Plaintiff's work. Plaintiff's original claim alleges substantial similarity (see pages 4-6 of Plaintiff's complaint). Plaintiff meets all legal requirements because his original Complaint alleges substantially similarity. In comparing Plaintiff's Manuscript to Defendant's Book, and by considering judicially noticeable facts, this Court can and should find that the two works share substantial similarities.

### Extrinsic Test

104.   In examining substantial similarity, the Ninth Circuit uses the "extrinsic test," which focuses on objective "articulable similarities" between the works at issue. The Court will find that the protectable elements, standing alone, are substantially similar. Applying the extrinsic test, the Court will also find that the elements of fiction, that is, the articulable similarities between the plot, themes, mood, setting and characters in the two works are substantially similar. In examining the two works, the Court must examine the substantial similarities throughout the book, and compare the total sequence of major events and the relationship between the MMC and FMC. Applying the Circuit's test for analyzing substantial similarity, and reading the texts at issue, only one conclusion can correctly deduced: Mills' Manuscript and Sparks' book and movie are substantially similar. Similarities between the works are within the

-30-

1  scope of copyright protection.  Despite the difference in characters' race, in examining
2  the works, the Court will find that the numerous examples of substantial similarity
3  cited by Plaintiff fall under the protection granted to copyrighted work. The
4  substantial similarities cited, given the easy access to the Plaintiff's manuscript, are
5  not general plot concepts, premises, or scenes a faire.  The substantial similarities do
6  not end at the basic premise of a young woman who falls in love with an attractive
7  bull rider. Rather, it goes far beyond it.

8      105.   In examining the plot and sequence of events, the Court will find that the
9  works are telling, materially, the same main story.   As stated previously, the
10  secondary, or B story, is not germane.

11      106.   Both works are romantic dramas centering on two lovers from dissimilar
12  backgrounds. Both works involve a privileged FMC falling in love with a MMC from
13  the "wrong side of the tracks," who is a bull rider (not, it should be noted, another type
14  of rodeo professional), and the sequence of events (minus the less marketed story of
15  the elderly couple) in Sparks' works, mirrors the trials and tribulations of the
16  blossoming relationship dramatized in Mills' work.

17      107.   The plot points and major characters referenced above, arc some
18  examples of substantial similarity and there are many others.  Through these
19  examples, one can see that the access that Defendants had to Mills' manuscript
20  provided a clear and detailed blueprint for the Sparks' novel and subsequent movie.

21      108.   In the end, a review of the two works demonstrates that the Plaintiff's
22  manuscript is substantially similar to the Defendant Book. The Court's reading the
23  two works must conclude that there are striking similarities.

24                          **COPYRIGHT INFRINGEMENT**

25      109.   Defendants' actions, as set forth above, constitute copyright infringement
26  in violation of the Copyright Act, 17 U.S.C. § 501, et seq.

27

28

-31-

### Substantial Similarity

110.   Plaintiff will meet the element of substantial similarity with respect to protectable expression through the discovery process, which will include a comparative analysis of the two works where Defendant(s) copied content from ten (10) pages of Plaintiff's manuscript.  The comparative analysis shows similarities between the two works so striking that it would be impossible for Plaintiff and Defendant to independently arrive at the same result.

### Protectable Expression

111.   Defendant(s) copied so much of Plaintiff's expression of the same ideas and concepts that their infringement reached the level of substantial similarity. Therefore, Plaintiff's comparative analysis report shows substantial similarity between the works with respect to protectable expression.

### Probative Access

112.   Plaintiff will also prove probative access together with copying and Defendant(s) have not denied access in their Motion to Dismiss.  Plaintiff's claim will pass the test that any audience will perceive substantial similarity between the Defendant's work and the protected elements of the Plaintiff's work; a test utilized by the Sixth District Court and several others.   Further, the Ninth Circuit Court has explained that the word 'copying' is shorthand for the infringing of any of the copyright owner's exclusive rights, described at 17 U.S.C. § 106.  Plaintiff will prove his exclusive rights by presenting his copyright registration No. TXu001996547/2016-03-11, which was also referenced in his Complaint.

//

//

//

-32-

## SECOND CLAIM OF RELIEF

### (Discrimination based on race under § 1981 of the
### Civil Rights Act of 1886 – against Defendant Hachette)

113.   Section 1981 prohibits racial discrimination in the making and enforcement of contracts U.S.C. § 1981(a). This statute provides that all persons "shall have the same right . . . to make and enforce contracts." 42 U.S.C. § 1981(a).

114.   To state a claim under § 1981, Plaintiff must allege facts that support each of the following three elements: (i) that the Plaintiff is a member of a racial class; (ii) that the Defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in § 1981.

115.   Plaintiff is of the African-American racial class.

116.   Defendant Hachette knew that Plaintiff is African American, and knew so at the time his manuscript was submitted to be considered for publication.

117.   Defendant Hachette discriminated against Plaintiff by refusing to enter into a publishing contract with Plaintiff because of Plaintiff's race.

118.   On information and belief, Defendant Hachette refused to enter into a publishing contract with Mr. Mills because Mr. Mills is African American, and Hachette believed that the storyline of Mr. Mills' manuscript would not be as profitable to Hachette because it featured African American primary characters.

119.   Instead, on information and belief, Defendant Hachette infringed on Mr. Mills' manuscript, changed the racial background of the main characters to white, and contracted with Defendant Sparks in order to market Mills' story to a broader audience.

120.   Plaintiff's second claim of racial discrimination is valid because the Plaintiff discovered the discrimination after Sparks novel was published (2013) and after Sparks movie (which is based upon his novel) was released (2015): In fact,

-33-

Plaintiff became aware of the Section 1981 violation within the last two years. Consequently, Plaintiff's knowledge of racial discrimination falls with the parameters of the statute of limitations for Section 1981 in California. Further, testimony from an editor at Grand Central Publishing (a subsidiary of Defendant Hachette Book Group), which publishes Defendant Sparks, will corroborate that the decision to reject Mills manuscript and enter into a contract with Sparks was solely based on race. Additionally, discovery evidence will show a pattern of racial discrimination in contracts (or lack thereof) with African-American writers, as well as a double-standard in the promotion and marketing of African-American writers contracted by Grand Central Publishing. The Plaintiff is just one example in a long list of African-American authors Hachette Book Group has discriminated against during the time period in question: prior to 2014.

121.   Defendant Hachette's actions violated Plaintiff's rights afforded to him under 42 U.S.C. § 1981(a), namely, Hachette denied Plaintiff the ability to make and perform a contract for publication of his manuscript.

122.   As to the statute, Plaintiff did not become aware of the violation of the "making "of a contract until after 2018. Consequently, the Plaintiff claim is well within the statute of limitations.

123.   Plaintiff has alleged sufficient facts.  Plaintiff alleges he is a member of a racial minority, as is evidenced by email sent by Mills' agent to the editor at Grand Central Publishing. Grand Central Publishing (a subsidiary of Hachette Book Group) overtly discriminated against the Plaintiff because of his race, according to an editor at Grand Central Publishing, who will be subpoenaed to testify: Grand Central Publishing chose to reject Mills' manuscript because he is Black, and decided to enter into a contract with Sparks because he is White. The Plaintiff did not become aware of this violation of Section 1981 law until after 2018. This overt fact of racially

-34-

discriminatory animus creates a plausible inference necessary to survive a motion to dismiss.

124.   Plaintiff suffered substantial damage as a result of Defendant Hachette's violation of 42 U.S.C. § 1981(a).

125.   Plaintiff seeks damages as a result of Defendant Hachette's actions in an amount to be determined at trial.

## RACIAL DISCRIMINATION

126.   Plaintiff repeats and incorporates by reference the statements and allegations contained above as though fully set forth herein.  Defendants' actions, as set forth above, constitute racial discrimination in violation of U.S.C. § 1981(a).

### Statute of Limitations

127.   Plaintiff alleges a claim of racial discrimination under Section 1981 federal, to which the four-year statute of limitations applies because the underlying tort is Plaintiffs' Section 1981 claim.  The issue of which statute of limitations applies to federal civil rights claims is a complex one and deserves more attention than the relatively brief treatment given to it by the defendants.

### Conspiracy To Discriminate

128.   Plaintiff is within the statute of limitations to make a claim of racial discrimination because the discrimination has been continuous and Defendant's conspiracy to infringe upon the work of an African American author is an ongoing act that falls well within the statute of limitations and within the time their discrimination was discovered, similarly upheld in the United States Supreme Court under National Railroad Passenger Corp. (Amtrak) v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).  Plaintiff could not know that he was discriminated against until he learned of the copyright infringement.

-35-

129.   Under the federal notice pleading standards, "a plaintiff's complaint need only provide a short and plain statement of the claim showing that the pleader is entitled to relief, sufficient to provide the defendant with fair notice; motion Rule 12(b)(6).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

A.   For injunctive relief, as follows: A permanent injunction enjoining and restraining Defendants, and all persons or entities acting in concert with it during the pendency of this action and thereafter perpetually from:

      i.   infringing Plaintiff's copyrighted works;

     ii.   indirectly, contributorily, or vicariously infringing Plaintiff's copyrighted works; and,

    iii.   conspiring, encouraging, inducing, allowing, abetting, or assisting others in performing any of the activities referred to in subparagraphs (i) - (ii) above.

B.   An award to Plaintiff of damages, including but not limited to, compensatory, statutory, and punitive damages, as permitted by law and in such amounts to be proven at trial.

C.   An award to Plaintiff of reasonable costs, including reasonable attorneys' fees.

D.   For pre and post-judgment interest as allowed by law.

E.   For such other relief as the Court may deem just and proper.


//

//

//

-36-

1

2

3                    **DEMAND FOR JURY TRIAL**

4           Plaintiff hereby demands a trial by the jury on his claims herein and all

5    issues and claims so triable in this action.

6    DATED:  January 29, 2021

7                                        By: *Mark A. Mills*

8                                            MARK A. MILLS
                                             IN PRO PER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                       -37-

28
_____
**FIRST AMENDED COMPLAINT FOR (1) COPYRIGHT INFRINGEMENT, (2) RACIAL DISCRIMINATION,
DEMAND FOR JURY TRIAL**

| Attorney or Party without Attorney:<br>MARK A. MILLS<br>100 S. DOHENY DRIVE, UNIT #223<br>LOS ANGELES, CA 90048<br>    Telephone No:  (424) 302-0988 | | | | For Court Use Only |
|---|---|---|---|---|
| Attorney For:  IN PRO PER | Ref. No. or File No.: | | | |
| Insert name of Court, and Judicial District and Branch Court:<br>UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA | | | | |
| Plaintiff:   Mark A. Mills<br>Defendant:   Nicholas Sparks, an individual, et al. | | | | |
| **PROOF OF SERVICE**<br>**By Federal Express** | Hearing Date: | Time: | Dept/Div: | Case Number:<br>CV20-8153-RGK(RAOx) |

1.   *I am over the age of 18 and not a party to this action. I am employed in the county where the shipment occurred.*

2.   I served copies of the First Amended Complaint; Motion for Leave to Amend Complaint

3.   By placing a true copy of each document in a sealed envelope by **Federal Express** with delivery fee
      prepaid as follows:
      a. Federal Express Tracking Number:
      b. Date of Shipment Prepared: Tue, Feb 2, 2021
      c. Place of Preparation: LOS ANGELES, CA 90026
      d. Addressed as follows: Diana Palacios | DAVIS WRIGHT TREMAINE LLP
                          865 S. Figueroa Street, 24th Floor Los Angeles, CA 90017

4.   *I am readily familiar with the business practice for collection and processing of correspondence as deposited with Federal Express*
      *Service on Tue, Feb 2, 2021 in the ordinary course of business*

                                          Recoverable cost Per CCP 1033.5(a)(4)(B)

5.  *Person Serving:*
      a. George A. Tavera, III                              **d.** *The Fee for Service was:*
      **b. FIRST LEGAL**                                     **e.** I am: Not a Registered California Process Server
         1517 W. Beverly Boulevard
         LOS ANGELES, CA 90026
      c. (213) 250-1111

6.   *I declare under penalty of perjury under the laws of the State of California and under the laws of the United States of America that*
      *the foregoing is true and correct.*

                                    02/02/2021
                                    _____          _____
                                        *(Date)*                              *(Signature)*



Judicial Council Form                    **PROOF OF SERVICE**                    *5315041*
Rule 2.150.(a)&(b) Rev January 1, 2007        **BY FEDERAL**                    *(4567595)*
                                              **EXPRESS**

| Attorney or Party without Attorney:<br>MARK A. MILLS<br>100 S. DOHENY DRIVE, UNIT #223<br>LOS ANGELES, CA 90048<br>Telephone No:  (424) 302-0988 | | | | For Court Use Only |
|---|---|---|---|---|
| Attorney For:  IN PRO PER | Ref. No. or File No.: | | | |
| Insert name of Court, and Judicial District and Branch Court:<br>UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA | | | | |
| Plaintiff:   Mark A. Mills<br>Defendant:  Nicholas Sparks, an individual, et al. | | | | |
| **PROOF OF SERVICE**<br>**By Federal Express** | Hearing Date: | Time: | Dept/Div: | Case Number:<br>CV20-8153-RGK(RAOx) |

1.   I am over the age of 18 and not a party to this action. I am employed in the county where the shipment occurred.

2.   I served copies of the First Amended Complaint; Motion for Leave to Amend Complaint

3.   By placing a true copy of each document in a sealed envelope by **Federal Express** with delivery fee
     prepaid as follows:
     a. Federal Express Tracking Number: 7727 9842 9783
     b. Date Shipment Prepared: Tue, Feb 2, 2021
     c. Place of Preparation: LOS ANGELES, CA 90026
     d. Addressed as follows: Linda Steinman | DAVIS WRIGHT TREMAINE LLP
                                                    1251 Avenue of the Americas, 21st Floor, New York, NY 10020

4.   I am readily familiar with the business practice for collection and processing of correspondence as deposited with Federal Express
     Service on Tue, Feb 2, 2021 in the ordinary course of business.

Recoverable cost Per CCP 1033.5(a)(4)(B)

5. *Person Serving:*
   a. George A. Tavera, III                                    d. *The Fee* for Service was:
   b. **FIRST LEGAL**                                          e. I am: Not a Registered California Process Server
      1517 W. Beverly Boulevard
      LOS ANGELES, CA 90026
   c. (213) 250-1111

6.   I declare under penalty of perjury under the laws of the State of California and under the laws of the United States of America that
     the foregoing is true and correct.

02/02/2021
_____
(Date)

_____
(Signature)



Judicial Council Form                    **PROOF OF SERVICE**                                            5315048
Rule 2.150.(a)&(b) Rev January 1, 2007        **BY FEDERAL**                                            (4567603)
                                                                **EXPRESS**



ORIGIN ID:JGXA     (213) 250-1111
JOCK ELLIS
FIRST LEGAL SUPPORT SERVICES
1517 W BEVERLY BLVD

LOS ANGELES, CA 90026
UNITED STATES US

SHIP DATE: 02FEB21
ACTWGT: 1.00 LB
CAD: 106055566/INET4340

BILL SENDER

TO   CLERK OF THE COURT
     USDC-LOS ANGELES
     255 EAST TEMPLE STREET

     LOS ANGELES CA 90012
(213) 894-0289          REF: 4567610
INV
PO                              DEPT

FedEx Ship Manager - Print Your Label(s)

FedEx
Express

WED - 03 FEB 4:30P
STANDARD OVERNIGHT

TRK#
0201    7727 9832 7527

WZ EMTA                    90012
                    CA-US   LAX

Extremely Urgent

2/2/2021

FedEx
Express

RECEIVED
CLERK, U.S. DISTRICT COURT
FEB - 3 2021
CENTRAL DISTRICT OF CALIF.